IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

MARY A. KINDRED,

    Plaintiff,

v.                                          No. 2:19-cv-2660-TLP-dkv

MEMPHIS LIGHT GAS & WATER;
ALONSIA HARDY, supervisor;
RENEE DANIEL, labor engagement,
diversity, & inclusion
specialist; ANGELA R. HEWLETT,
former manager of labor and
employee relations; and ERIC
CONWAY, manager employment
services,

    Defendants.

_____

ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL
and
ORDER DENYING MOTION FOR SUBPOENA OF CELLPHONE RECORDS
and
REPORT AND RECOMMENDATION FOR PARTIAL *SUA SPONTE* DISMISSAL

_____

On September 30, 2019, the plaintiff, Mary A. Kindred ("Kindred"), filed a *pro se* employment discrimination complaint on the court-supplied form against Memphis Light, Gas and Water ("MLGW"), MLGW Supervisor Alonsia Hardy ("Hardy"), MLGW Labor Engagement, Diversity, and Inclusion Specialist Renee Daniel ("Daniel"), MLGW former Manager of Labor and Employment Relations Angela R. Hewlett ("Hewlett"), and MLGW Acting Manager Employment

Services Eric Conway ("Conway").  (Compl., ECF No. 1.)  In her
complaint, Kindred alleges violations of the Age Discrimination in
Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (the "ADEA") and
the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112 *et
seq.*, as amended by the ADA Amendments Act of 2008 (the "ADA").[1]
(*Id.* at ¶ 1.)  Kindred has also alleged violations of the Family
and Medical Leave Act (the "FMLA").[2]  Along with the complaint,

---

[1] In Kindred's official EEOC charge of discrimination, Kindred
did not allege age discrimination or retaliation.  (ECF No. 1-1.)
The Supreme Court's decision in *Fort Bend County, Texas v. Davis*,
139 S. Ct. 1843, 1850-51 (2019), makes clear that Title VII's
charge-filing requirement is not jurisdictional.  Rather, the
requirement in Title VII is procedural – a mandatory "processing
rule".  *Id.*  As such, the charge-filing requirement must be
enforced by the court if a party "properly raise[s]" it.  *Id.* at
1849 (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005)).
Therefore, at this stage of Kindred's suit, the court will address
Kindred's age discrimination claim despite the fact that such claim
is not present in her original EEOC charge of discrimination.

[2] Kindred originally filed her complaint on September 30,
2019. (Compl., EFC No. 1.)  On October 1, 2019 Kindred then filed
an "attachment" to her complaint, which included her request for
relief as well as a letter from the United States Department of
Labor, Wage and Hour Division in Memphis, Tennessee regarding a
complaint for violations of the FMLA which Kindred had filed.
(Attach., ECF No. 6.)  Kindred's attachment is essentially an
amendment to her original complaint.  Rule 15(a) of the Federal
Rules of Civil Procedure states that a party may amend as of right
within 21 days of serving the complaint or if the pleading is one
to which a responsive pleading is required, 21 days after service
of a responsive pleading.  Fed. R. Civ. P. 15(a).  Otherwise, the
party may only amend his or her complaint with the consent of the
opposing party or the court's leave.  *Id.*  Because Kindred is a
*pro se* plaintiff proceeding *in forma pauperis*, her complaint must
be screened before service of her complaint can even occur.
Accordingly, the court will consider her attachment as an amendment
to her complaint and include portions of the attachment in the
analysis where relevant.

2

Kindred filed a *pro se* motion for leave to proceed *in forma pauperis*, (Mot., ECF No. 2), which this court granted on October 2, 2019, (Order, ECF No. 7). This case has been referred to the United States Magistrate Judge for management and for all pretrial matters for determination and/or report and recommendation as appropriate. (Admin. Order 2013-05, Apr. 29, 2013.)

On October 7, 2019, Kindred filed a motion for appointment of counsel and motion for subpoena of cellphone records. (ECF No. 3.) As to Kindred's request for appointment of counsel, pursuant to 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel." Similarly, under 42 U.S.C. § 2000e-5(f)(1), "upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney." However, "[t]he appointment of counsel in a civil proceeding is not a constitutional right." *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003); *see also Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2002) ("[T]he plaintiffs were not entitled to have counsel appointed because this is a civil lawsuit.") Appointment of counsel is "'a privilege that is justified only by exceptional circumstances.'" *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993)(quoting *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985)).

> In determining whether "exceptional circumstances" exist, courts have examined "the type of case and the abilities of the plaintiff to represent himself."

3

> *Archie v. Christian*, 812 F.2d 250, 253 (5th Cir. 1987);
> *see also Poindexter v. FBI*, 737 F.2d 1173, 1185 (D.C.
> Cir. 1984). This generally involves a determination of
> the "complexity of the factual and legal issues
> involved." *Cookish v. Cunningham*, 787 F.2d 1, 3 (1st
> Cir. 1986).

*Id.* at 606. Appointment of counsel is not appropriate when a *pro se* litigant's claims are frivolous or when her chances of success are extremely slim. *Lavado*, 992 F.2d at 606 (citing *Mars v. Hanberry*, 752 F.2d 254, 256 (6th Cir. 1985)); *see also Cleary v. Mukasey*, 307 F. App'x 963, 965 (6th Cir. 2009)(same).

Nothing in Kindred's complaint distinguishes this case from other employment discrimination claims filed by *pro se* litigants. In addition, the issues are not complex, and Kindred has demonstrated that she understands the issues and can represent herself. Accordingly, Kindred has not satisfied her burden of demonstrating that appointment of counsel would be appropriate in this case. The motion for appointment of counsel is therefore denied.

As to Kindred's motion for subpoena, Kindred simply states that she is requesting an order for subpoena of cellphone records. (ECF No. 3.) Kindred's motion, for what is essentially discovery, is improper at this stage of her cause of action. Kindred may seek discovery at the proper time. As such, Kindred's motion for subpoena of cellphone records is denied at this time.

For the reasons set forth below, it is recommended that all claims against the individual defendants Hardy, Daniel, Hewlett and Conway be dismissed *sua sponte*; that Kindred's claim for retaliation under the ADEA and her claim under the FMLA be dismissed *sua sponte*; and that service of process be issued to MLGW as to Kindred's claim of age discrimination and her claims of failure to accommodate and retaliation under the ADA.

## I.   PROPOSED FINDINGS OF FACT

In this case, Kindred alleges discrimination in violation of the ADEA based on her age (over forty) and ADA on the basis of a disability, as well as violations of the FMLA. (Compl. ¶¶ 1, 9, ECF No. 1; Attach., ECF No. 6.) Kindred, however, does not identify a disability when listing disability as a basis of discrimination in the body of the form complaint. (*Id.* at ¶ 9.) From what the court can glean from the attachment, Kindred alleges that she was discriminated against based on her anxiety and depression. (*Id.* at ¶ 10, Attach. at 9.) As discriminatory conduct, Kindred lists the following actions: termination of employment, failure to accommodate disability, unequal terms and conditions of employment, and retaliation. (*Id.* at ¶ 6.)

According to Kindred, she was originally employed as an armed security officer by Clifford Dates and Associates Security Company, doing business as CDA Security Co. ("CDA"). (*Id.* at ¶ 10, Attach. at 6.) CDA contracted with MLGW to provide both armed

5

and unarmed security officers at various locations. (*Id.*) Kindred
states that she worked for CDA for about ten years and at all times
was posted at the two main MLGW locations on Main Street in
downtown Memphis. (*Id.*) Kindred also explains that in order to
work at either location, the security guard had to meet certain
qualifications which were established by MLGW. (*Id.*) Those
qualifications included a weapons certification and passing a
Customer Contact Test. (*Id.* at 7.)

In 2015, CDA and MLGW agreed to terminate the contract and
convert the services to "in house" security. (*Id.*) According to
Kindred, a contract was reached through negotiations with Mayor
Jim Strickland and the former CEO of MLGW. (*Id.*) Kindred alleges
that the contract provided for former CDA employees to become
employees of MLGW with an annual salary of $37,440.00 based on an
hourly rate of $18.00 per hour for forty-hour work weeks in
addition to benefits. (*Id.*) Furthermore, Kindred alleges that
there was an expectation that at forty hours a week, they would be
considered full-time employees, with all benefits of the FMLA,
short term disability, workers compensation, and retirement plan.
(*Id.*)

In January 2016, Kindred stated that all former CDA employees
worked thirty hours per week. (*Id.*) Later, in July of 2016,
MLGW's human resource office began a "reorientation" program in
which former CDA workers would be given an orientation, discuss

6

their new schedules, and receive packets regarding their benefits. Kindred alleges that those who went through the "reorientation" program were then scheduled for forty-hour weeks. (*Id.*) Kindred states that after the first group of former CDA guards went through reorientation with MLGW, her hours began to fluctuate. (*Id.*) According to Kindred, she would work anywhere between twenty to twenty-eight hours per week. (*Id.*) Kindred asked her supervisor, Hardy, why her work schedule was fluctuating and when she would go through the reorientation process to receive her schedule and benefits package. (*Id.*) Hardy allegedly responded, "I don't know." (*Id.*)

Subsequently, Kindred went to Linda Ford ("Ford"), a human resources representative, and asked about receiving a full-time schedule. (*Id.*) Ford told Kindred that she would most likely be in the next group of former CDA employees; however, Kindred alleges that she was never called in for reorientation. (*Id.*) According to Kindred, she then attempted to follow up with Ford, but did not receive any explanation. (*Id.*) Kindred states that it was at this point that she began feeling as though age was a factor in her treatment. (*Id.*)

Kindred alleges that she observed that younger employees were not subject to some of the same treatment. (*Id.*) According to Kindred, she met all qualifications for full-time employment, yet she was removed from the location she had been stationed at for

7

years and replaced with a younger employee who had worked for CDA for only three years. (*Id.* at 8.) Kindred also complains that she was assigned to a location in which she feared for her life because it was potentially dangerous at night and there was no other security guard assigned to work with her. (*Id.*) Kindred alleges that several younger employees were hired to work at the downtown locations who had not passed the Customer Contact Test – which Kindred states MLGW eventually removed from the requirements. (*Id.*) In addition, Kindred alleges that some new hires were not even former CDA employees and were given full time positions and preferences for job locations. (*Id.*) Kindred also alleged that some younger employees were hired as full-time armed security officers when they did not have the required license to carry a firearm. (*Id.*)

Kindred states that the "disparate treatment based on age[]" became more intensified in 2017." (*Id.*) Kindred points to a cost of living allowance which was given to all full-time employees but not to part-time employees. (*Id.*) Kindred asked about entries on her paystub and why her annual salary as posted was $37,440.00 and $38,188.80 for the last two years when she had not actually earned those amounts. (*Id.*) According to Kindred, after her inquiry, her hours became more "erratic." As an example, Kindred states that she worked only one eight-hour shift one week. (*Id.*)

Kindred contends that stress due to inadequate pay, being removed from her full-time post while younger employees replaced her, working in a dangerous location, and never being given "clear cut" answers to her questions caused her to request medical leave under the FMLA. (*Id.*) Defendant Conway, manager of employment services, denied Kindred's request for leave under the FMLA based on insufficient hours. (*Id.*) Kindred alleges that she asked for a record of her hours during the relevant twelve-month time frame, but that she received no response. (*Id.*)

After the denial of her request under the FMLA, Kindred submitted a statement from her doctor which stated that she needed a medical leave of absence. (*Id.* at 9.) Kindred's medical leave began on June 7, 2018. (*Id.*) Kindred contends that she followed MLGW protocol and texted or called her supervisor every Monday to inform him whether she was cleared to return to work. (*Id.*) Defendant Hardy, her supervisor, subsequently sent Kindred a short-term disability form. (*Id.*) According to Kindred, the claim form was submitted to "UNUM Life Insurance Co." along with necessary documentation from Elizabeth Story, a licensed professional counselor who was providing counseling to Kindred for anxiety and depression. (*Id.*) Kindred alleges that the insurance company denied her claim of short-term disability, citing the contract with MLGW which provided coverage only for full-time employees. (*Id.*)

On January 8, 2018, Kindred alleges that she called MLGW and asked about certain time entries on her pay stub. (*Id.*) Following the call, Hardy informed Kindred that she needed to attend a meeting with Conway on the coming Wednesday. (*Id.*) Kindred, however, did not attend this meeting, alleging that she was ill and could not make it. (*Id.*) At that time, the meeting was rescheduled for January 17, 2018. (*Id.*) Kindred did not attend this meeting either, contending that the conditions on the road from a recent winter storm prevented her from safely driving. (*Id.*) At that time, Conway informed Kindred that she had two weeks to provide a return to work date and, according to Kindred, Kindred agreed to do so. (*Id.*)

Kindred alleges that her counselor estimated six weeks before she could return to work. (*Id.*) According to Kindred, Conway did not accept this. Subsequently, Kindred gave Conway a date of April 1, 2018 as a return date from her counselor. (*Id.*) Following this exchange, Kindred received a termination notice dated February 8, 2018 advising Kindred that she was being terminated effective February 9, 2018. (*Id.*)

Kindred also lists three instances in which she claims MLGW – or its employees – knowingly made false statements about her. Kindred alleges that MLGW stated she violated the Sick Leave and Short-Term Disability Salary Continuation policy. (*Id.*) According to Kindred, she did not violate the policy because she

10

attempted to receive short-term disability and filed the proper
paperwork but was denied. (*Id.*) Additionally, Kindred alleges
that Conway claims she failed to engage in the interactive process
under the ADA. (*Id.*) Kindred contends, however, that she never
brought up the subject of disability under the ADA and that the
first time MLGW or its employees mentioned the ADA was in a letter
on January 10, 2018 where Conway "attempted to recharacterize" the
scheduled meeting as an "attempt" to engage in the interactive
process. (*Id.*) Kindred claims that at no point did Conway or
Hardy mention the ADA to her. In addition, Kindred contends that,
although she did not initiate a request for accommodation, MLGW
should not have required her to furnish an end date to her
"disabling condition." Lastly, Kindred claims that MLGW has
accused her of not complying with the weekly call procedure when
she was on medical leave. (*Id.*)

Kindred also attached a letter to the director of the State
of Tennessee Human Rights Commission dated January 11, 2018.
(Letter, ECF No. 1-2.) This letter generally alleges the same
facts as in Kindred's complaint with some additions. In this
letter, Kindred states that CDA employees were guaranteed thirty
– not forty – hours per week and that for a time, this was
consistent. (*Id.* at 2.) Kindred, however, states that Hardy began
moving her from her original station, stating that he needed the
position for a full-time employee. (*Id.*) According to Kindred,

11

she had applied for the position and was not considered.  (*Id.*)
Kindred states that the position was given to a younger man in his
mid-thirties who had worked for CDA at a different location.  (*Id.*
at 3.)  After not being hired, Kindred stated that she reached out
to a supervisor who would have been knowledgeable as to Kindred's
experience and asked her for a letter.  (*Id.*)

Kindred expanded on the inconsistency of her job schedule
beginning in September 2016.  According to Kindred, she worked at
two or three various locations and would work anywhere from eight
to thirty hours any given week.  (*Id.*)  Kindred also detailed why
her new station location was so dangerous.  (*Id.* at 5.)  According
to Kindred, because of her concerns, she requested a meeting on
May 31, 2017 with Hardy and a "Mr. Cunningham."  (*Id.*)  Kindred
was asked to leave her weapon in the car during the meeting.  (*Id.*)
During the meeting, Kindred alleges that she attempted to explain
her concerns about working the isolated location alone, but that
she was instead met with criticism regarding her attire.  (*Id.* at
5-6.)

As to the denial of leave under the FMLA, Kindred's attached
letter states that she was certain she had the required 1,250
hours.  (*Id.* at 6.)  According to Kindred, Conway sent her a form
that reflected slightly more than 1,100 hours; but that this was
incorrect.  (*Id.* at 7.)  Kindred states that there were at least
three occasions where hours were missing from her posted hours.

(*Id.*)  Apparently, these wages were eventually paid, but Kindred states that her hours on record were never fixed.  (*Id.*)

Kindred also provides more detail as to her phone call on January 8, 2018.  According to Kindred, she spoke to someone named Cynthia about two entries on her pay stub that she did not understand.  (*Id.*)  Cynthia did not know the answer to one of Kindred's questions and told Kindred that she would find out.  (*Id.* at 8.)  Kindred then called Cynthia the next day.  (*Id.*)  Kindred states that Cynthia told her it "didn't mean anything" and asked Kindred why she needed to know.  (*Id.*)

Kindred further states in this letter that after the phone call with Conway in which he scheduled the January 10, 2018 meeting, an attempt was made to hand-deliver a memorandum confirming the details of the upcoming meeting, but Kindred was not at home.  (*Id.*)  Hardy then called Kindred to ask whether she could meet him and an unidentified person or if they could come to her in order to give her the memo.  (*Id.*)  Kindred states that she said no.  (*Id.*)

Kindred filed an EEOC charge of discrimination against the defendants on March 21, 2018.  (ECF No. 1-1.)  The EEOC then issued a Right to Sue Letter on July 2, 2019, (ECF No. 1-1), which Kindred received on July 5, 2019, (Compl. ¶ 14, ECF No. 1).  The EEOC's letter notified Kindred that the EEOC was unable to conclude that the information obtained established violations of the ADA.  (ECF

13

No. 1-1.)  Kindred's original complaint does not list any relief sought; however, Kindred later filed an "Attachment" to her *pro se* complaint on October 1, 2019.[3]  In this attachment, Kindred includes a statement that she is seeking "justice, reinstatement of job, benefits, and backpay." (Attach., ECF No. 6.)  In addition to her ADA and ADEA claims, Kindred has also attached a Letter from the U.S. Department of Labor Wage and Hour Division Memphis District Office regarding a claim under the FMLA.

II.  PROPOSED CONCLUSIONS OF LAW

A.  28 U.S.C. § 1915(e)(2) Screening

Pursuant to Local Rule 4.1(a), service will not issue in a *pro se* case where the *pro se* plaintiff has been granted leave to proceed *in forma pauperis* until the complaint has been screened under 28 U.S.C. § 1915(e)(2).  The clerk is authorized to issue summonses to *pro se* litigants only after that review is complete and an order of the court issues.  This report and recommendation will constitute the court's screening.

The court is required to screen *in forma pauperis* complaints and to dismiss any complaint, or any portion thereof, if the action:

(i)     is frivolous or malicious;

(ii)    fails to state a claim on which relief may be granted; or

---

[3] *See supra* note 2.

14

     (iii)   seeks monetary relief against a defendant who is immune
              from such relief.

28. U.S.C. § 1915(e)(2).

    B.   <u>Standard of Review for Failure to State a Claim</u>

In assessing whether the complaint in this case states a claim on which relief may be granted, the standards under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009), and in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007), are applied. *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). "Accepting all well-pleaded allegations in the complaint as true, the Court 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)(quoting *Iqbal*, 556 U.S. at 681)(alteration in original). "[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679; *see Twombly*, 550 U.S. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the

nature of the claim, but also 'grounds' on which the claim rests.").

The Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002), makes clear that ADEA plaintiffs are not required to plead the elements of a *prima facie* case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Morgan v. St. Francis Hosp.*, No. 19-516, 2019 WL 5432041, at * 1-2 (6th Cir. Oct. 3, 2019)(applying the same standard from *Swierkiewicz* to a claim under the ADA). All that is required is that the complaint satisfies Rule 8(a)'s simplified pleading standard. *Swierkiewicz*, 534 U.S. at 513. Federal Rule of Civil Procedure 8(a) provides in relevant part that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "But where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Additionally, the Sixth Circuit has held that a plaintiff under the FMLA must plead enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Rhoades v. R & L Carriers, Inc.*, 491 F. App'x 579, 583-84 (6th Cir. 2012).

"*Pro se* complaints are to be held to less stringent standards than formal pleadings drafted by lawyers and should therefore be liberally construed." *Williams*, 631 F.3d at 383 (internal quotation marks omitted). *Pro se* litigants, however, are not exempt from the requirements of the Federal Rules of Civil Procedure. *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989); *see also Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011)("[A] court cannot create a claim which [a plaintiff] has not spelled out in his pleading")(internal quotation marks omitted); *Payne v. Sec'y of Treasury*, 73 F. App'x 836, 837 (6th Cir. 2003)(affirming *sua sponte* dismissal of complaint pursuant to Fed. R. Civ. P. 8(a)(2) and stating, "[n]either this court nor the district court is required to create Payne's claim for her"); *cf. Pliler v. Ford*, 542 U.S. 225, 231 (2004)("District judges have no obligation to act as counsel or paralegal to *pro se* litigants."); *Young Bok Song v. Gipson*, 423 F. App'x 506, 510 (6th Cir. 2011)("[W]e decline to affirmatively require courts to ferret out the strongest cause of action on behalf of *pro se* litigants.  Not only would that duty be overly burdensome, it would transform the courts from neutral arbiters of disputes into advocates for a particular party.  While courts are properly charged with protecting the rights of all who come before it, that responsibility does not encompass advising litigants as to what legal theories they should pursue.").

C.    <u>Kindred's Claims against the Individual Defendants</u>

Kindred has named Hardy, Daniel, Hewlett, and Conway as defendants in her cause of action. In *Wathen v. General Electric Co.*, the Sixth Circuit rejected the notion that individual employees, supervisors, and managers could be held personally liable under Title VII and similar statutory schemes like the ADA and the ADEA. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404-05 (6th Cir. 1997); *but see Mitchell v. Chapman*, 343 F.3d 811, 827 (6th Cir. 2003)(explaining that individual liability can be possible under the FMLA). Here, however, Kindred has not indicated the capacity in which these individuals are named but because she has included their specific title, the court assumes each individual is named in his or her official capacity. (Compl., ECF No. 1.) To the extent the individual defendants are named in their individual capacity, it is recommended that claims against them be dismissed.

As to whether an individual can be held liable in his or her official capacity under the ADEA or the ADA, the Sixth Circuit has explained "there is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer." *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 n.2 (6th Cir. 2001) (explaining this in the context of Title VII and other similar statutory schemes). District courts in the Sixth

Circuit have interpreted this language in various ways. *See, e.g.,*
*Ankofski v. M&O Marketing, Inc.*, 218 F. Supp. 3d 547, 552-53 (E.D.
Mich. 2016)(explaining that the Sixth Circuit has been silent on
whether an individual can be sued in his or her official capacity);
*Maudlin v. Inside Out Inc.*, No. 3:13-CV-00354-TMR, 2014 WL 1342883,
at *3 (S.D. Ohio 2014)(finding that where the company is named as
a defendant, suing individual employees in their official capacity
is redundant); *Trimble v. IQ Group*, No. 1:10-cv-26, 2010 WL
3851398, at *6 (E.D. Tenn. 2010)(holding that the owner of the
company was considered an "alter ego" of the company and could be
considered an employer for purposes of employment discrimination
statutes).   The question of official capacity suits against
employees of a private sector employer under the FMLA appears to
be unanswered as well, although the FMLA does define "employer" as
someone who acts directly or indirectly in the interest of the
employer to any of the employees of such employer.   29 U.S.C. §
2611(4)(A)(ii)(I).

In construing the language of the Sixth Circuit's opinion in
*Little*, the liability of each of the defendants in Kindred's suit
depends on whether Kindred has made a showing that "he or she could
be considered the 'alter ego' of the employer."  *Little*, 256 F.3d
at 362.  At least one district in the Sixth Circuit, however, has
found this analysis unnecessary when the plaintiff has also named
the employer as a defendant. *See Monsul v. Ohashi Technica U.S.A.,*

*Inc.*, No. 2:08-cv-958, 2009 WL 2430959, at *3 (S.D. Ohio Aug. 6, 2009)(explaining that even if the defendants were held liable under an official capacity theory, the corporate defendant will ultimately be the one responsible). *See also Maudlin*, 2014 WL 1342883, at *3-4 (S.D. Ohio Apr. 3, 2014)(holding that official capacity liability is "simply another avenue for a plaintiff to establish liability on an employer"). This court agrees that naming individuals as defendants in their official capacity is redundant when the corporate entity or employer is also named as defendant and can ultimately be held liable as the employer. Because Kindred has also named MLGW, the employer, as a defendant, the determination of whether the named individuals are liable in his or her official capacity is irrelevant. Accordingly, it is recommended that all claims against the individual defendants, Hardy, Daniel, Hewlett, and Conway, be dismissed for failure to state a claim.

D.    Kindred's Retaliation Claim Under the ADEA

        Kindred alleges that the defendants retaliated against her. (Compl. ¶ 9, ECF No. 1.)  It is unclear, however, whether the retaliation claim is brought pursuant to the ADEA or the ADA.[4] Under either the ADA or the ADEA, to establish a claim of

---

[4] The court recommends only that any claim of retaliation under the ADEA be dismissed.  Accordingly, a claim of retaliation under the ADA is not analyzed here.

retaliation, a plaintiff must show: (1) she engaged in protected activity; (3) the employer was aware of this activity; (3) the employer subsequently took an adverse employment action against her; and (4) there was a causal connection between the adverse employment action. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008); *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)("Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision, and [] it is therefore appropriate to look to cases construing Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause.").

Protected activity for purposes of a retaliation claim under the ADEA includes "oppo[sing] any practice made an unlawful employment practice" and making a charge, testifying, assisting, or participating in an "investigation, proceeding, or hearing." *Speck v. City of Memphis*, 594 F. Supp. 2d 905, 923 (W.D. Tenn. 2009)(explaining that protected activity under the ADEA is the same as protected activity under Title VII).

The only protected activity under the ADEA which is alleged by Kindred is her filing the EEOC charge, which occurred after the adverse employment action of termination. Kindred thus fails to establish the required causal relationship between the protected activity and her termination. Accordingly, Kindred fails to allege

sufficient facts for this court to infer the essential elements of
retaliation under the ADEA.

E.    Kindred's Claims Under the FMLA

Kindred attached a letter issued from the U.S. Department of
Labor Wage and Hour Division regarding a complaint filed against
MLGW for violations of the FMLA.[5]    This court will construe
Kindred's complaint as including a claim for violations of the
FMLA.    The Sixth Circuit has recognized two types of claims under
the FMLA:    entitlement claims and retaliation claims.    *Edgar v.
JAC Products, Inc.*, 443 F.3d 501, 506-08 (6th Cir. 2006).    To
establish an entitlement claim under the FMLA, a plaintiff must
show that: (1) she was an eligible employee; (2) the defendant was
an employer as defined under the FMLA; (3) she was entitled to
leave under the FMLA; (4) she gave the employer notice of her
intention to take leave; and (5) the employer denied the plaintiff
FMLA benefits to which she was entitled.    *Edgar*, 443 F.3d at 507.

An "eligible employee" is one who has been employed for at
least twelve months by the employer and at least 1,250 hours during
the previous 12-month period.    29 U.S.C. § 2611(2)(A).    Kindred
applied for FMLA leave, but Conway denied her request stating that
she did not have the required 1,250 hours.    In her complaint,
Kindred makes the factual assertion that she had more than 1,250

---

[5] *See supra* note 2.

hours.   Kindred has named her employer as MLGW, which meets the definition of "employer" under the FMLA.  *See* 29 U.S.C. § 2611(4). Additionally, Kindred's complaint includes factual assertions that she both notified MLGW of her intent to take leave under the FMLA and that she was ultimately denied leave under the FMLA.

Kindred, however, cannot establish that she is "entitled" to FMLA leave.  An employee is "entitled" to leave when the employee falls into one or more of five categories.   29 U.S.C. §§ 2612(a)(1)(A)-(E).  The only category pertinent to Kindred's claim is when the employee is suffering from a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The FMLA defines a "serious health condition" as an "illness, injury, impairment, or mental condition that involves . . . continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(B). The Code of Federal Regulations provide that continuing treatment by a health care provider "includes . . . [a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition."  29 C.F.R. § 825.115(C).  Incapacity is defined as the "inability to work. . . or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom."   29 C.F.R. § 825.113(b). Incapacity usually must be demonstrated by the plaintiff's health care provider's determination that the plaintiff is unable to

23

perform the job in light of her illness.  *See, e.g., Brannon v.
Oshkosh B'Gosh*, Inc., 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995).

Kindred alleges that she sought medical leave due to the
stress of inadequate earnings, being moved from her regular full-
time post to work in a potentially dangerous area, and not being
able to get "clear cut" answers to her questions.  Kindred,
however, does not make any factual allegations that at the time
she sought medical leave under the FMLA she was suffering from a
serious health condition making her incapacitated or unable to
perform her job.  Nor does she allege that she provided any type
of medical documentation at the time of requesting leave under the
FMLA which demonstrated that her physician believed she was
incapacitated or unable to perform her job.

The only factual allegations Kindred makes is that she
submitted a letter from her unnamed doctor certifying that she
needed medical leave of absence and information from a licensed
counselor *after* her FMLA request had been denied.  (Compl. ¶ 10,
ECF No. 1.)  At that time, Kindred was given medical leave of
absence, presumably under an MLGW leave policy.  Accordingly,
because Kindred fails to sufficiently allege facts which allow
this court to infer that she was entitled to leave under the FMLA
when she applied, it is recommended that her claim be dismissed
for failure to state a claim for which relief can be granted.

24

As to a potential claim of retaliation under the FMLA, the FMLA protects employees from retaliation because they have used FMLA leave. *Arban v. West Pub. Corp.*, 345 F.3d 390, 403 (6th Cir. 2003). A plaintiff must demonstrate that: (1) the employee availed herself of a protected right under the FMLA by notifying the employer of her intent to take leave; (2) she suffered adverse employment action; and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse action. *Edgar*, 443 F.3d at 508. As explained above, Kindred has not alleged sufficient facts showing that she had a serious medical condition, thus entitling her to relief. Where the individual has not demonstrated that he or she is entitled to relief, a plaintiff cannot establish a retaliation claim. *See Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir. 2009)("Because [plaintiff's] leave was not on account of a serious health condition, he cannot establish the first element of [a retaliation claim], that he engaged in an activity protected by the FMLA.") Therefore, because Kindred has failed to allege sufficient facts for this court to infer the essential elements of a retaliation claim under the FMLA, it is recommended that the claim be dismissed for failure to state a claim upon which relief can be granted.

### III. RECOMMENDATIONS

For the forgoing reasons, it is recommended that Kindred's claim of retaliation under the ADEA, her claims for violations of the FMLA, and her claims against the individual defendants be dismissed *sua sponte* under 28. U.S.C. § 1915(e)(2)(ii) for failure to state a claim upon which relief can be granted.

As to Kindred's failure to accommodate and retaliation under the ADA and her age discrimination claim under the ADEA, it is recommended that the clerk be directed to issue process to the MLGW and deliver that process to the marshal for service along with a copy of this Report and Recommendation; that service of the complaint, (Compl., ECF No. 1), be made on MLGW pursuant to Rule 4(h)(1) of the Federal Rules of Civil Procedure; and that all costs of service be advanced by the United States.

It is further recommended that Kindred be ordered to serve a copy of every document filed in this case on the attorney for the defendant, make a certificate of service on every document filed, familiarize herself with the Federal Rules of Civil Procedure and this court's local rules, promptly notify the clerk of any change of address or extended absence, and be warned that failure to comply with these requirements, or any other order of the court, may result in the dismissal of his case without further notice.

Respectfully submitted this 6th day of January, 2020.

s/Diane K. Vescovo
DIANE K. VESCOVO
CHIEF UNITED STATES MAGISTRATE JUDGE

26

NOTICE

Within fourteen (14) days after being served with a copy of this
report and recommended disposition, a party may serve and file
written objections to the proposed findings and recommendations.
A party may respond to another party's objections within fourteen
(14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).
Failure to file objections within fourteen (14) days may constitute
a waiver of objections, exceptions, and further appeal.